## IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF VIRGINIA
## ABINGDON DIVISION

| | | |
|---|---|---|
| **BETTY FAYE HAVENS,** | ) | |
| | ) | |
| Plaintiff, | ) | Case No. 1:12CV00018 |
| | ) | |
| v. | ) | **OPINION** |
| | ) | |
| **CAROLYN W. COLVIN, ACTING** | ) | By: James P. Jones |
| **COMMISSIONER OF SOCIAL** | ) | United States District Judge |
| **SECURITY,**[1] | ) | |
| | ) | |
| Defendant. | ) | |

*Vernon M. Williams, Wolfe, Williams, Rutherford & Reynolds, Norton, Virginia, for Plaintiff; Eric P. Kressman, Regional Chief Counsel, Region III, Elizabeth Corritore, Regional Assistant Counsel, and Kenneth DiVito, Special Assistant United States Attorney, Office of the General Counsel, Social Security Administration, Philadelphia, Pennsylvania, for Defendant.*

In this social security case, I vacate the final decision of the Commissioner and remand for calculation and payment of benefits.

I

Plaintiff Betty Faye Havens filed this action challenging the final decision of the Commissioner of Social Security (the "Commissioner") denying her claim for supplemental security income ("SSI") pursuant to Title XVI of the Social Security

---

[1] Carolyn W. Colvin became the Acting Commissioner on February 14, 2013, and is substituted for Michael J. Astrue as the defendant in this suit pursuant to Federal Rule of Civil Procedure 25(d).

Act (the "Act"), 42 U.S.C.A. §§ 1381-83f (West 2012 & Supp. 2013). Jurisdiction of this court exists under 42 U.S.C.A. § 1383(c)(3).

Havens protectively applied for SSI on October 30, 2008, alleging that she has been unable to work as a result of her mental impairments since June 20, 2003. Her claim was denied initially and upon reconsideration. A series of hearings before an administrative law judge ("ALJ") were subsequently held.

The first hearing occurred on November 4, 2010, during which the plaintiff's attorney requested an amended alleged onset date of October 30, 2008, the date of protective filing. The hearing was then continued to allow the plaintiff to receive psychological testing. A second hearing was held on March 10, 2011. The plaintiff's attorney again moved for an amended alleged onset date of October 30, 2008. The ALJ granted this motion and agreed to an additional continuance to allow the plaintiff to undergo further psychological testing by a physician of choice. The plaintiff's third round of psychological testing was scheduled, however, for two weeks after the plaintiff's third scheduled hearing date of July 13, 2011. The plaintiff's attorney did not request another postponement of the case, however, and the ALJ held the third hearing as scheduled. Both the plaintiff and a vocational expert ("VE") testified.

The ALJ issued a decision on July 26, 2011, finding that Havens could perform a full range of work with some non-exertional limitations and thus was not

disabled under the Act.  Havens underwent additional psychological testing two days later, on July 28, 2011.  She submitted the results of these tests, along with her request for review, to the Social Security Administration's Appeals Council. The Appeals Council denied her request, thereby making the ALJ's decision the final decision of the Commissioner.  Havens then filed a complaint in this court seeking judicial review of the Commissioner's decision.

The parties have filed cross motions for summary judgment, which have been briefed.  The case is ripe for decision.

## II

Havens was 37 years old at the time of the ALJ's decision.  She claims disability based upon post traumatic stress disorder ("PTSD"), major depressive disorder, anxiety and borderline intellectual functioning.  (R. at 305.)  Havens has a limited educational background.  She reported suffering physical and sexual abuse during her childhood.  (R. at 44.)  At the age of sixteen, she was married to a much older man, who she reported abused her.  Havens testified that her husband forced her to drop out of school in order to tend their home when she was in the eighth grade.  (R. at 39, 45-46.)  The plaintiff's school records document a history of poor achievement.  (R. at 361-62.)  She was enrolled in special education courses, and often received very poor marks.  Havens testified that she continues to struggle

with reading and writing, which has discouraged her from even attempting to acquire a driver's license.  (R. at 63.)

Havens has had a job outside the home only once, as a housekeeper at a hotel.  She held this position for only a week or two before quitting, claiming the demands of the job were overwhelming for her.  (R. at 555.)  This job is Havens' only substantial gainful activity of record, and she has not engaged in any substantial activity since the alleged onset of disability.  (R. at 296-99.)

After thirteen years of marriage, Havens was divorced from her first husband.  She was remarried to a man she met playing videogames on the internet with the help of a friend.  (R. at 66-67.)  Throughout her life, Havens has been completely supported by her husbands.  (R. at 41.)  She does not pay bills or handle any of her finances as a result of her challenges with mathematics.  (R. at 65.)  She reports that she can perform some basic addition, but struggles with any other calculation.  *Id.*  Her husband filled out the forms associated with her application for benefits.  (R. at 311.)  Havens reports that she passes most of her days watching television and sometimes doing laundry or dishes.  (R. at 313.)  She experiences problems sleeping that often force her to sleep during the day.  (R. at 314.)  She never leaves her home alone.  (R. at 315.)  She enjoys watching television, playing video games — which she apparently often does with assistance

— and coloring.  (R. at 317.)  Havens stated that she panics when around groups of people and must be reminded to take her medications.  (R. at 315, 319.)

Havens' mental status and abilities have been medically evaluated on a number of occasions.  On March 15, 2006, Havens saw her primary care physician, Karen Elmore, M.D., with complaints of worsening depression and trouble sleeping.  (R. at 390.)  Dr. Elmore noted that the plaintiff "keeps herself isolated" and exhibits symptoms of PTSD.  She gave the plaintiff Zoloft, a prescription anti-depressant.  *Id.*

On the same day, Havens underwent a clinical assessment at Community Counseling Services at Mount Rogers Community Services Board ("Mount Rogers").   (R. at 372-79).   The counselor noted Havens reported "feeling unwanted" and easily agitated with frequent mood swings.  The plaintiff exhibited poor stress management, insomnia, and social isolation.  Havens reported feelings of hopelessness, low energy and fatigue, as well as experiencing flashbacks and hearing voices.  The plaintiff's appearance, perceptions, intellectual functioning and thought content were observed to be unremarkable.  Havens also exhibited psychomotor retardation, slowed speech, impaired concentration, difficulties with sleeping and appetite, as well as a flat, sad and dysthymic mood.  The counselor diagnosed Havens as suffering from major depressive disorder, recurrent and mild without psychotic features and "r/o" (rule out) PTSD.  (R. at 378.)  The counselor

recommended one year of counseling and assigned a Global Assessment of Functioning ("GAF") score of 60.[2]   The records do not indicate that Havens followed through on the recommended counseling at that time.

Nearly three years later, on February 9, 2009, Havens was evaluated by Angelia Berry, Psy.D, a licensed clinical psychologist. (R. at 462-65.) Dr. Berry noted that Havens' chief complaints were PTSD, major depression, and panic attacks. Dr. Berry observed that Havens was cooperative and independently completed her intake paperwork.[3] The plaintiff reported symptoms including sleep and appetite disturbance, isolation, crying, anger, sadness, decreased motivation and fatigue. She also stated that she suffered from panic attacks and that she had attempted suicide in 2004 by cutting herself with a can opener. Nonetheless, she denied any history of self-injurious behavior, as well as any history of

---

[2] A GAF score indicates an individual's overall level of functioning at the time of examination. It is made up of two components: symptom severity and social occupational functioning. A GAF score ranging from 61 to 70 indicates some mild symptoms or some difficulty in social, occupational, or school functioning; a GAF score ranging from 51 to 60 denotes functioning with moderate symptoms or moderate difficulty in social, occupational, or school functioning; a GAF score ranging from 41 to 50 indicates functioning with serious symptoms or any serious impairment in social, occupational, or school functioning. Am. Psychiatric Ass'n, *Diagnostic and Statistical Manual of Mental Disorders* 32-34 (4th ed. 2000).

[3] This is an interesting observation, and the only example in the record of Havens completing such paperwork on her own. Given the plaintiff's subsequent poor performance on some of the tests Dr. Berry administered during this evaluation, this observation seems inconsistent with the rest of the evidence in the record.

hallucinations.  Havens further reported that she had no social activity outside the home.

Dr. Berry observed that Haven's fund of information was below average and that her working memory showed moderate impairment.  As a part of this evaluation, Havens solved simple addition problems but could do no other type of arithmetic.  She read a simple sentence but struggled to write one.  Dr. Berry noted that "Mrs. Havens' self-report was somewhat disjointed and unclear at times in regard to mental health."  (R. at 464.)  Dr. Berry also noted that Havens had discontinued taking her Zoloft prescription after only three days in 2006, explaining to her doctor that she was "fine now."  Ultimately, Dr. Berry diagnosed the plaintiff with depressive disorder and anxiety disorder and assigned a GAF score of 62.  In her report, Dr. Berry stated that Havens' symptoms may interfere with her ability to handle daily stress and remember work information. Although Dr. Berry noted that Havens was incapable of handling her financial resources, she concluded that Havens would likely be capable of understanding simple and complex directions, despite her memory deficits.

On April 28, 2009, the plaintiff returned to Mount Rogers to undergo another clinical assessment.  (R. at 468-475.)  Havens told the counselor that she had been feeling "okay" until an altercation with her husband.  (R. at 468.)  She reported domestic abuse, panic attacks and nightmares.  Havens also stated that she

lives in near total isolation.  Her "only friend is her husband and a lady in the trailer park."  (R. at 468.)  She claimed that she is unable to be in groups.  The counselor observed that Havens was irritable, anxious, nervous, worried, suspicious and fearful.  She further exhibited dependency in relationships, hyper-responsive and rapid thoughts, flashbacks and hallucinations, recurrent intrusive distressing thoughts and other symptoms of domestic violence in the home.  The counselor opined that Havens suffered from severe impairments in money management, ability to access resources and transportation, as well as moderate impairments in shopping and social skills and no impairments in nutrition, housekeeping, taking medication, hygiene or laundry.  The counselor diagnosed Havens as having PTSD, rule out major depressive disorder and panic disorder, and assigned a GAF score of 50.

On May 12, 2009, the plaintiff requested and received a decrease in her Zoloft prescription, as well as the addition of an anti-anxiety medication, BuSpar. (R. at 477.)  Subsequent to that change, between June 12, 2009, and December 11, 2009, Havens failed to attend nearly all of her scheduled counseling session with Patty McAndrews at Mount Rogers.[4]  (R. at 488-491, 494-500.)  On September 24,

---

[4] Failure to follow through on recommended treatment may be interpreted as a sign of the lack of severity of a claimant's alleged disability.  In this case, it appears that the plaintiff is totally dependent on her husband to obtain transportation to these appointments, and she lacks any other social network that might have been able to assist. Counselors consistently characterized Havens as being willing to engage in treatment; her

2009, Havens did appear for her appointment and the staff there conducted a clinical assessment update as a result of the large gap in her treatment. The counselor opined that Havens experienced severe impairments in nutrition, money management, housekeeping, taking medication, shopping, accessing resources, social skills and transportation. The counselor believed Havens was only moderately impaired in doing laundry and had no impairment in hygiene. This counselor observed the plaintiff's need to work on her coping skills and impulse control, and assigned a GAF score of 50.

On November 6, 2009, Havens attended another counseling session at Mount Rogers. The counselor observed her to be anxious, paranoid, and withdrawn. (R. at 491.) The counselor further noted that Havens demonstrated impaired judgment, poor insight, poor impulse control, low energy and sleep disturbance. Havens attended an additional appointment two weeks later in which she was observed to exhibit many of the same symptoms. (R. at 531.)

It is apparent that Havens stopped going to Mount Rogers for a time after this appointment. She did not return until October of the next year, at which time the counselor completed yet another initial assessment. (R. at 533.) During this evaluation, Havens reported suffering from hallucinations involving her first husband, saying that she thought she heard his voice and that he was going to

_____

failure to attend sessions, therefore, seems to be another symptom of her lack of capacity, rather than an indicator of a lack of severity.

-9-

"come back and get [her]." (*Id.*)  The counselor further observed Havens to have presented at the appointment suffering from impaired dental hygiene.[5]   The counselor also noted that Havens exhibited reduced eye contact and a constricted, dysthymic and anxious mood.  She was withdrawn, showed dependency in her relationships and had difficulty sleeping. (R. at 534.)   She showed traits of disabling phobias and feared losing control.  (R. at 535.)  This counselor concluded that the plaintiff was markedly impaired in her ability to manage finances and obtain transportation.  The counselor further opined that Havens was moderately impaired in her abilities to be accepted socially by others, to cooperate with service providers, and to manage impulsivity.  According to this counselor, she would have minor impairments in developing and maintaining a social network, but would not be impaired in preparing meals, housekeeping, taking medications, going shopping, personal hygiene, laundry, accessing community resources or interacting appropriately in social situations.   (R. at 536.)   This counselor diagnosed PTSD and panic attacks and assigned a GAF score of 55.

Finally, Havens has been evaluated twice during the pendency of her claim, the results of which were consistent, but leading the counselors to draw differing conclusions.  The first of these assessments was conducted by Dr. Angelia Berry,

---

[5] This observation is corroborated by the record of Havens' visit to her primary care physician on September 29, 2009, in which she was found to have presented with very poor dentition and to be suffering from a gum infection.  (R. at 518.)

who had previously evaluated Havens.  (R. at 542-550.)  Dr. Berry noted that, in contrast to her prior evaluation, Havens' husband completed the intake paperwork on her behalf.  Moreover, Dr. Berry stated that Havens' performance during the prior evaluation was "notably better" than her performance during this administration of tasks, including her ability to recall her personal history and events.[6]  Dr. Berry recorded that Havens' symptoms included sleep and appetite disturbance, sadness and crying, lost of interest, decreased motivation, fatigue, isolation, and feeling hopeless and worthless.  Havens reported daily anxiety and frequent panic attacks.  Havens denied having experienced hallucinations since 2004, and she denied any history of self-injury.

Dr. Berry conducted a mental status exam, during the course of which the plaintiff did not perform as well on a number of tasks as she had during her previous examination.[7]  Dr. Berry also tested Havens using the Wechsler Adult

---

[6] At her previous appointment, Havens told Dr. Berry that she had been attending counseling for the previous four years and that she had been married to her second husband for three months.  At this appointment, Havens told Dr. Berry that she had not attended counseling since 2005 and had been married to her second husband for a year.  Dr. Berry found this conflicting history to create a question of credibility.  It should be noted, however, that Havens appears to have consistently reported inconsistent versions of this information, including to the ALJ.  For example, Havens testified that she was married in February 2007 — two years before she first met with Dr. Berry — and she told another evaluator that she has been in "counseling every week or so for 'maybe 6 years'" with Patty McAndrews at Mount Rogers.  (R. at 554.)

[7] For example, Havens did not successfully complete a simple addition problem, as she had in the past.  She was unable to read a simple sentence and did not correctly follow multi-step instructions.

Intelligence Scale, Fourth Edition ("WAIS-IV), on which Havens earned a Full Scale IQ of 57, which falls in the extremely low range of intellectual functioning.

Having completed all of these tests, Dr. Berry concluded that Havens' effort, or lack thereof, had rendered the results questionable. Dr. Berry noted that Havens had lost the ability to read a simple sentence or complete intake paperwork, and that she was no longer able to remember the town of her birth or her social security number. Dr. Berry found these results unlikely given an absence of any reported traumatic brain injuries or illness. Nonetheless, she diagnosed the plaintiff as suffering from dysthymic disorder, anxiety disorder and borderline intellectual functioning, and assigned a GAF score of 59. Dr. Berry opined that the plaintiff was moderately impaired in her ability to make judgments on complex work-related decisions, and mildly to moderately impaired in understanding, remembering and carrying out complex instructions. She further stated that Havens was mildly impaired in interacting appropriately with the public and responding to usual work situations and changes in routine.

Believing that Dr. Berry's report did not accurately characterize her impairments, Havens requested that the ALJ permit her to undergo an additional psychological evaluation. The ALJ granted a continuance for this purpose, but the new evaluation was not completed until after the rescheduled ALJ hearing. The ALJ, therefore, did not consider the results of the test completed by Pamela S.

Tessnear, Ph.D, a licensed clinical psychologist.  (R. at 553-567.)  The Appeals Council did consider this new evaluation, but concluded that it provided no new information that could have affected the ALJ's decision.

Dr. Tessnear noted that Havens and her husband arrived for her appointment nearly an hour early, and that her husband completed her intake paperwork. Havens told Dr. Tessnear that she had been attending counseling consistently with Patty McAndrews at Mount Rogers for "maybe 6 years," and she denied any suicide attempts.  (R. at 554.)  Havens reported the same series of symptoms she had described in previous psychiatric consultations.  She stated that she was nervous around people and had panic attacks in crowds.  Havens reported that she had quit school when she was younger because she could not read and the teachers did not make time for her.  She further stated that she had been referred to speech therapy, in addition to her special education classes, while she was in school.  The plaintiff omitted any reference to violent abuse by her first husband, and alternatively described herself as a widow and divorced.  Havens reported that she does some household chores, but she rarely leaves her home.  She stated that she plays children's games on a computer, but she does not engage in any outdoor activities, does not manage any finances, and does not watch television.

Similar to Dr. Berry, Dr. Tessnear also administered the WAIS-IV and reached nearly identical results.  Dr. Tessnear concluded that the plaintiff's

intellectual functioning falls within the mild mental retardation range.   Dr. Tessnear noted that this finding was consistent with her reported educational and work history, and that Havens' effort and statements were credible.[8]   Dr. Tessnear further observed that Havens' relatively flat intellectual profile "is consistent with what is often observed in people whose functioning is within the Mild Mental Retardation range."   (R. at 558.)   Havens' performance on other tasks during the evaluation was also similar to those reported by Dr. Berry.   Dr. Tessnear assigned a GAF score of 52.

Dr. Tessnear compared the results of her tests to those of Dr. Berry, and concluded that the inconsistent results, rather than indicating questionable effort, were consistent with the documented variability in Havens' functioning throughout her treatment record and should be interpreted as suggesting further evidence of intellectual impairment.   Dr.   Tessnear opined that Havens would be unable to meet competitive standards in sustaining an ordinary routine without special supervision, completing a normal workday and workweek without interruptions from psychologically based symptoms, dealing with normal work stress, and responding appropriately to changes in a routine work setting.   She further concluded that Havens was unable to understand and remember detailed directions,

---

[8] It should be noted that Dr. Tessnear was aware of Dr. Berry's concerns regarding the previous evaluation, and therefore was especially sensitive to the issue of credibility.

carry out detailed instructions, and travel in unfamiliar places.  Finally, she concluded that these impairments were likely to last more than twelve months.

The ALJ found that Havens suffered from the severe impairments of borderline intellectual functioning, dysthymic disorder, anxiety disorder NOS, illiteracy, history of post traumatic stress disorder, and history of panic disorder. The ALJ concluded that despite these impairments, the plaintiff retained the RFC to perform a full range of work at all exertional levels, so long as the work was simple and unskilled and required no good reading skills and only minimal interaction with the public.  The ALJ credited the VE's testimony at the hearing that Havens could work as a laundry folder, laundry worker, or garment folder.  (R. at 85-86.)

## II

The plaintiff bears the burden of proving that she is under a disability. *Blalock v. Richardson*, 483 F.2d 773, 775 (4th Cir. 1972).  The standard for disability is strict.  The plaintiff must show that her "physical or mental impairment or impairments are of such severity that [she] is not only unable to do [her] previous work but cannot, considering [her] age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy …." 42 U.S.C.A. § 1382(a)(3)(B).

In assessing disability claims, the Commissioner applies a five-step sequential evaluation process. The Commissioner considers whether the claimant: (1) has worked during the alleged period of disability; (2) has a severe impairment; (3) has a condition that meets or equals the severity of a listed impairment; (4) could return to her past relevant work; and (5) if not, whether she could perform other work present in the national economy. *See* 20 C.F.R. § 416.920(a)(4) (2013). If it is determined at any point in the five-step analysis that the claimant is not disabled, the inquiry immediately ceases. *Id.*; *McLain v. Schweiker*, 715 F.2d 866, 868-69 (4th Cir. 1983). The fourth and fifth steps of the inquiry require an assessment of the claimant's RFC, which is then compared with the physical and mental demands of the claimant's past relevant work and of other work present in the national economy. *Id.* at 869. If the claimant can perform work that exists in significant numbers in the national economy, then she does not have a disability. 20 C.F.R. § 404.1566(b) (2013).

In accordance with the Act, I must uphold the Commissioner's findings if substantial evidence supports them and the findings were reached through the application of the correct legal standard. *Craig v. Chater*, 76 F.3d 585, 589 (4th Cir. 1996). Substantial evidence means "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971) (internal quotation marks and citation omitted).

Substantial evidence is "more than a mere scintilla of evidence but may be somewhat less than a preponderance." *Laws v. Celebrezze*, 368 F.2d 640, 642 (4th Cir. 1966).

Most importantly, it is the role of the ALJ, not this court, to resolve evidentiary conflicts, including inconsistencies in the evidence. *See Hays v. Sullivan*, 907 F.2d 1453, 1456 (4th Cir. 1990). However, because the Appeals Council considered Havens' additional evidence before denying her request for review, this court must "review the record as a whole, including the new evidence, in order to determine whether substantial evidence supports the Secretary's findings." *Wilkins v. Sec'y, Dep't of Health & Human Servs.*, 953 F.2d 93, 96 (4th Cir. 1991) (en banc). "This task is a difficult one, since in essence the court must review the ALJ's decision — deemed the final decision of the Commissioner — in the light of evidence which the ALJ never considered, and thus never evaluated or explained." *Ridings v. Apfel*, 76 F. Supp. 2d 707, 709 (W.D. Va. 1999). Thus, this court needs to carefully balance its duty to review the entire record with its obligation to abstain from making factual determinations. *See Davis v. Barnhart*, 392 F. Supp. 2d 747, 751 (W.D. Va. 2005).

Previous courts have navigated this fine-line by limiting the analysis of the additional evidence, focusing the inquiry on the narrow question of whether the new evidence "is contradictory, presents material competing testimony, or calls

into doubt any decision grounded in the prior medical reports." *Id.* (internal quotation marks and citations omitted). If the evidence does create a conflict, then the case is remanded for the Commissioner to weigh and resolve the conflicting evidence. *Id.* "If not, then the case can be decided on the existing record without a remand." *Id.*

The plaintiff in this case argues that a finding of disability is warranted under section 12.05 of 20 C.F.R. pt. 404, subpt. P, app. 1 (2013). Section 12.05 defines mental retardation as "significantly subaverage general intellectual functioning with deficits in adaptive functioning initially manifested during the developmental period;" that is, "the evidence demonstrates or supports onset of the impairment before age 22." Section 12.05(B) provides that the disability is sufficiently severe to meet this requirement where the claimant has a valid verbal, performance or full scale IQ score of 59 or less. The ALJ did not consider the applicability of this section. (R. at 14.)

In support of this argument, the plaintiff relies on evidence that was considered by the Appeals Council, but not by the ALJ. The new evidence I must consider is Dr. Tessnear's assessment, the second of two psychological evaluations and WAIS-IV tests performed while or shortly after this case was decided by the ALJ. In considering this evidence, in the context of the totality of the evidence contained in the record, I believe the plaintiff has satisfied her burden of

demonstrating that she meets the definition outlined in section 12.05(B).  Havens has undergone two separate WAIS-IV tests reaching similar conclusions about her intellectual capacity.  The results of Dr. Berry's test showed an IQ of 57, while Dr. Tessnear's test resulted in an IQ of 58.  Both evaluators noted the plaintiff's history of very poor performance in school, as well as her incapacity to manage her own financial affairs given her limited intellectual abilities.  It seems clear from the record that at no point or age in her life has Havens ever independently managed her own affairs, instead relying on others who often subjected her to violent abuse, further supporting the inference that her abilities have been impaired since before the age of 22.

Dr. Berry questioned the results of her test, noting the difference in capacity Haven demonstrated in her second evaluation when compared with her first.  Dr. Berry noted that Haven's narrative history of her personal affairs was inconsistent, and that she had apparently lost the ability to complete certain tasks, such as reading simple sentences or performing simple addition.  Dr. Berry found this decline incredible, and concluded it represented a lack of effort on Havens' part that undermined the validity of the test.

Dr. Tessnear, however, addressed this variability in her evaluation.  She noted that through the plaintiff's history of evaluation and treatment, her capacity to complete certain tasks and her specific descriptions of her psychological and

personal history have varied. Rather than undermining the plaintiff's credibility, Dr. Tessnear interpreted these inconsistencies to serve as additional evidence of the plaintiff's limited abilities. For example, Havens claimed she suffered hallucinations involving her first husband nearly as often as she denied having hallucinations at all. She variably claimed to have attempted suicide — or not — and she frequently gave inconsistent dates regarding the only job she ever worked and the date she married her current husband. These variations do not indicate a conscious design to deceive, but rather indicate the plaintiff's lack of orientation to the fact and circumstances before her.

Moreover, Dr. Tessnear's evaluation itself is compelling. She was fully aware of the circumstances surrounding Dr. Berry's evaluation and the need to exercise special caution with regard to the plaintiff's credibility. Dr. Tessnear also noted that Havens' limited capacity would necessitate supervision and for instructions to be repeated and explained, leading to a poor ability to adapt to change in the work environment. Dr. Tessnear's opinion, therefore, appears to strongly support the conclusions Dr. Berry reached in her second evaluation, as well as the applicability of section 12.05(B) to Havens' circumstances.

The weight of Dr. Tessnear's opinion, which considered in the context of all of the evidence presented in the record, renders the ALJ's decision not to apply the requirements of section 12.05(B) unsupported by substantial evidence.[9]

Although I need not consider this issue, I also believe that the ALJ's conclusion that the plaintiff's case did not satisfy the listing requirements of section 12.02 of 20 C.F.R. pt. 404, subpt. P, app. 1 (2013) was also unsupported by substantial evidence.   In order to satisfy the listing requirements of section 12.02, defining disability on the basis of organic mental disorders, a claimant must satisfy the requirements of both paragraphs A and B.   To satisfy paragraph A, a claimant must demonstrate:

---

[9]   The Commissioner blames the plaintiff for the failure to present Dr. Tessnear's report to the ALJ in a timely fashion.  It is true that the ALJ warned plaintiff's counsel at the time of the second hearing, on March 10, 2011, that the attorney needed to set up an appointment with Dr. Tessnear "sooner than later."  (R. at 53.)  A new hearing date was fixed by the ALJ.  On May 6, 2011, plaintiff's counsel wrote the ALJ advising that an appointment had been made with Dr. Tessnear for July 28 and pointing out that the new hearing date was July 8.  (R. at 369.) It appears that the hearing date was then changed to July 13.   At that hearing, the ALJ noted that the appointment with Dr. Tessnear was "coming up," and told the plaintiff, "For whatever reason your attorney never contacted our office back and after not hearing anything further we assumed that you weren't able to get an appointment with Dr. Tesnier [sic] and we went ahead and rescheduled the case. . . . [W]e don't know what Dr. Tesnier's report is going to say, I think we'll look at it post hearing if it comes in before my decision, but this is a pretty old case and we need to get it off the docket."  (R. at 58-59.)  The ALJ then issued his decision on July 26, before the date of the scheduled appointment with Dr. Tessnear.

While plaintiff's counsel likely should have acted with more promptness in scheduling the appointment, the ALJ obviously misunderstood the sequence of events.  In any event, the plaintiff should not be punished for her counsel's mistakes.

[A] loss of specific cognitive abilities or affective changes and the medically documented persistence of at least one of the following: 1. Disorientation to time and place; or 2. Memory impairment, either short-term (inability to learn new information), intermediate, or long-term (inability to remember information that was known sometime in the past); or 3. Perceptual or thinking disturbances (e.g., hallucinations, delusions); or 4. Change in personality; or 5. Disturbance in mood; or 6. Emotional lability (e.g., explosive temper outbursts, sudden crying, etc.) and impairment in impulse control; or 7. Loss of measured intellectual ability of at least 15 I.Q. points from premorbid levels or overall impairment index clearly within the severely impaired range on neuropsychological testing, e.g., the Luria–Nebraska, Halstead–Reitan, etc.

 The claimant must also satisfy paragraph B, which requires that the claimant's symptoms as defined in paragraph A result in a least two of the following:

1. Marked restriction of activities of daily living; or 2. Marked difficulties in maintaining social functioning; or 3. Marked difficulties in maintaining concentration, persistence, or pace; or 4. Repeated episodes of decompensation, each of extended duration.

In this case, the record is clear that the plaintiff has suffered from a number of the symptoms defined in paragraph A, including disorientation to time and place, memory impairments, perceptual or thinking disturbances, disturbance in mood, and emotional lability.  Given her near total social isolation, her inability to provide her own transportation and her marked limitations in intellectual functioning, there does not seem to be substantial evidence to support the ALJ's conclusion that factors one, two and three under paragraph B also do not apply.

-22-

III

Based on my review of the record as a whole, I find there is not substantial evidence to support the Commissioner's conclusion that Havens failed to meet the criteria of section 12.05(B). I hold that the Commissioner erred in finding that Havens was not disabled and not entitled to SSI benefits. Therefore, I will remand the case to the Commissioner for an award of benefits. An appropriate final judgment will be entered.

DATED:   September 13, 2013

/s/  James P. Jones
United States District Judge